Karl G. Anuta (OR Bar No. 851423)
Law Office of Karl G. Anuta PC
735 SW 1st Ave, 2nd Fl.
Portland, OR 97204
Tel. (503) 827-0320
kga@lokga.net

Corey Oken (OR Bar No. 240290)
Law Office of Karl G. Anuta, PC
735 SW 1st Ave., 2nd Fl.
Portland, OR 97204
Tel. (503) 827-0320
corey@lokga.net

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NO MORE FREEWAYS, CHRISTOPHER SMITH, ELIOT NEIGHBORHOOD ASSOCIATION, NEIGHBORS FOR CLEAN AIR, FAMILIES FOR SAFE STREETS, ASSOCIATION OF OREGON RAIL AND TRANSIT ADVOCATES, and BIKELOUD,<br><br>Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, UNITED STATES FEDERAL HIGHWAY ADMINISTRATION, and SHAILEN BHATT, Administrator of the Federal Highway Administration,<br><br>Defendants. | Case No.:<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, U.S. Department of Transportation Act, 49 U.S.C. § 303(c), Federal Highways Act, 23 U.S.C. §§ 134 *et seq.*) |

**PAGE 1 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  **STATEMENT OF THE CASE**

2  1.

3  Defendants United States Department of Transportation ("DOT") and the United

4  States Federal Highway Administration ("FHWA") approved the Interstate 5 ("I-5") Rose

5  Quarter Freeway Expansion & Improvement Project ("the Project") by issuing a new

6  Finding of No Significant Impact ("FONSI") and a Revised Supplemental Environmental

7  Assessment ("RSEA") for the Project. These documents were prepared in conjunction

8  with the Oregon Department of Transportation ("ODOT"). The Project is located in

9  Portland, Oregon, on I-5 between Interstate 405 (I-405) and Interstate 84 (I-84). It

10  includes the Broadway/Weidler interchange, and changes to adjacent surface streets in

11  the vicinity of Broadway/Weidler interchange. An image showing the Project area

12  outlined in blue is provided:

13
14
15
16
17
18  
19
20
21
22
23
24

**PAGE 2 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    As part of the Project's actions, Defendants (in conjunction with ODOT) plan to, in

2    part, expand the freeway and to construct new auxiliary lanes and shoulders

3    between I-84 to the south and I-405 to the north, in both southbound and northbound

4    directions. In addition, defendants/ODOT will re-stripe the I-5 mainline to provide the

5    I-5 southbound auxiliary lane between the I-84 off-ramp and the Morrison Bridge/SE

6    Portland/Oregon Museum of Science and Industry off-ramp. Removal, and in some

7    cases construction or reconstruction, of structures over I-5 would also occur.

8                                    2.

9    Urban freeways have significant impacts on the cities in which they exist, and the

10   Project will have a significant impact on the City of Portland and its residents – in part

11   because of the tremendous cost of the Project which is currently estimated at

12   approximately $1.9 Billion. This is the newest, and largest, of the Project cost estimates.

13   Plaintiffs suspect that future estimates and actual costs will be higher. This Billion-dollar

14   expansion is proposed, despite the existence of much more fiscally conservative

15   alternatives that can satisfy the Project's purposes and needs.

16                                   3.

17   In approving the Project, Defendants have violated the National Environmental

18   Policy Act ("NEPA") and the regulations implementing NEPA which is a violation of the

19   Administrative Procedure Act ("APA"), section 4(f) of the U.S. Department of

20   Transportation Act ("Transportation Act") within the meaning of the APA, as well as the

21   Federal Highways Act and the regulations and policies implementing that statute, which

22   are also violations of the APA.

23   / / / /

24

**PAGE 3 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1                                          4.

2       Plaintiffs seek relief declaring that Defendants' approval of the Project violates

3 NEPA, the Transportation Act, the Federal Highways Act, and the APA, as well as an

4 order vacating the FONSI and RSEA and remanding the matter with directions requiring

5 Defendants to prepare an Environmental Impact Statement ("EIS"). Defendants should

6 also be enjoined from implementing the Project pending further review of the Project

7 and compliance with all applicable provisions of law.

8                                   **JURISDICTION**

9                                          5.

10       This Court has jurisdiction pursuant to 28 U.S.C. § 1331(a) (action for declaratory

11 and injunctive relief arising under the Constitution and laws of the United States); 28

12 U.S.C. §§ 2201, 2202 (power to issue declaratory or injunctive relief in cases of actual

13 controversy); and 5 U.S.C. §§ 702-706 (the APA), because (1) the action arises under

14 the laws of the United States, (2) each Defendant is sued in its official capacity, and (3)

15 there is a present, actual and justiciable controversy between the parties.

16                                          6.

17       Plaintiffs commented on the Revised Supplemental Environmental Assessment

18 (RSEA), as well as engaged with the FHWA and ODOT at every opportunity afforded

19 the public. In so doing, Plaintiffs have exhausted all administrative remedies available to

20 them as required by the APA. The challenged agency action is final and subject to this

21 Court's review pursuant to 5 U.S.C. §§ 702, 704, and 706. Some of Plaintiffs also

22 submitted a letter requesting supplemental analysis under NEPA.

23 / / / /

24

**PAGE 4 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

**VENUE**

2

7.

3    Venue properly rests in the District of Oregon pursuant to 28 U.S.C. § 1391(e)

4    and 5 U.S.C. § 703 (APA) because all or a substantial part of the events or omissions

5    giving rise to the claims herein occurred within this judicial district and the agency

6    records in question are located in this district. This case is filed properly in Portland,

7    Oregon pursuant to Local Rule 3.2.

8

**PARTIES**

9

8.

10    Plaintiff NO MORE FREEWAYS ("NMF") is an unincorporated association of

11    individuals and organizations in the State of Oregon dedicated to reducing the impact of

12    urban freeways on climate change, air quality and urban quality of life. NMFs' members

13    make the community aware of adverse impacts of urban freeway expansions and

14    advocate for responsible alternatives. The organization's membership includes many

15    individuals who live, work, go to school and recreate in the impact area of this project,

16    the I-5 corridor generally, and the Portland metropolitan regional freeway network.

17    NMFs' members pursue, and have concrete plans to continue pursuing the

18    aforementioned activities, as well as a reduction of community impacts from urban

19    freeways and freeway expansions. These intersections of NMF and its members are

20    substantial and are adversely affected by Defendants' failure to comply with NEPA. The

21    requested relief will redress the injuries of No More Freeways and its members.

22

9.

23    Plaintiff CHRISTOPHER SMITH is a member of NMF, a resident of Portland,

24

**PAGE 5 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1   Oregon, and is interested in seeking a better climate future, and preserving and

2   enhancing what's left of the neighborhoods near the I-5 corridor. He regularly utilizes

3   the Project Area, and would be harmed by the increased noise, traffic, and pollution that

4   comes with a roadway expansion.

5                                    10.

6       Plaintiff ELIOT NEIGHBORHOOD ASSOCIATION ("Eliot") is a neighborhood

7   association and nonprofit in the State of Oregon, dedicated to achieving a better

8   environment, better physical accommodations, and an improved quality of urban life for

9   their residents. Eliot's members participate by meeting to discuss private and public

10  projects affecting the neighborhood. The organization's membership includes all people

11  who live or work within their boundaries who consent to being members. Eliot's

12  members and board members pursue, and have concrete plans to continue pursuing,

13  reducing diesel pollution in the neighborhood, reducing vehicle miles traveled through

14  the neighborhood, encouraging the welfare of the neighborhood, encouraging

15  immediate development of underused properties in the area, encouraging transit use

16  through the area, encouraging bicycle transportation and other non-car uses, improving

17  public trust in government spending through fiscal responsibility, and improving public

18  urban design.

19                                   11.

20      Plaintiff NEIGHBORS FOR CLEAN AIR ("Neighbors") is an Oregon environmental

21  nonprofit which advocates for better air quality in Oregon with an emphasis on public

22  health, and empowering Oregonians with information and tools to ensure everyone can

23  breathe clean air. Plaintiff Neighbors has more than three thousand members, the

24

**PAGE 6 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    majority of whom live in the state of Oregon and many of whom participate in advocacy

2    for the improvement of local air quality. Some of these members live, work, and play in

3    the area affected by the expansion of the I-5 freeway, or teach or have children

4    attending Harriet Tubman Middle School, which is directly adjacent to the freeway.

5    Conducting extended construction and increasing traffic, without first conducting a

6    full environmental impact statement, affects their ability to protect

7    community health and provide information about risk to our members. These

8    intersections of Neighbors for Clean Air and its members are substantial and are

9    adversely affected by Defendants' failure to comply with NEPA. The requested relief will

10   redress the injuries of Neighbors for Clean Air and its members.

11                                    12.

12       Plaintiff FAMILIES FOR SAFE STREETS OF OREGON AND SOUTHWEST

13   WASHINGTON ("Families") supports individuals who have lost loved ones or been

14   injured in traffic crashes, and also advocates for life-saving changes to our

15   transportation networks. The investment choices for the Rose Quarter project will

16   impact street safety in the Project Area as well as in other areas NOT funded because

17   of the choice to invest in this roadway expansion.

18                                    13.

19       Plaintiff ASSOCIATION OF OREGON RAIL AND TRANSIT ADVOCATES

20   ("AORTA") is the assumed business name of "Oregon Association of Railway

21   Passengers," a public education 501(c)(3) nonprofit Oregon corporation, established in

22   1976 to promote safe, economical, environmentally responsible, and equitable

23   transportation. Mobility for people and materials are essential freedoms, and the Rose

24

**PAGE 7 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  Quarter Project represents a diversion of resources that could go toward better

2  alternatives that is also less harmful to AORTA's members.

3                                    14.

4       Plaintiff BIKELOUD PDX ("BikeLoud") is a membership organization dedicated to the

5  mission of ensuring Portland follows its own goal to make the city a place where one

6  quarter of all trips are done on bicycles. BikeLoud members daily bicycle through the

7  Rose Quarter Project Area and will be impacted by any investment and expansion

8  made in this project.

9                                    15.

10      Defendant United States Department of Transportation ("DOT") is a cabinet level

11  agency of the United States Government and its principal place of business is located at

12  1200 New Jersey Avenue, SE, Washington, DC 20590. DOT is the executive

13  department of the federal government responsible for approval of federally funded

14  highway projects.

15                                    16.

16      United States Federal Highway Administration ("FHWA") is an operating

17  administration of DOT, and its principal place of business is located at 1200 New Jersey

18  Avenue, SE, Washington, DC 20590. FHWA is the administration primarily responsible

19  for highway planning and funding. FHWA, through its Oregon Division and in

20  conjunction with ODOT, prepared, reviewed and approved the all drafts of the

21  Environmental Assessment, including the current RSEA and the FONSI.

22  / / / /

23  / / / /

24

**PAGE 8 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1          17.

2          SHAILEN BHATT is the chief executive officer and administrator of the FHWA. He is

3   responsible for the administration, operations, and activities of FHWA and its various

4   divisions. Administrator Bhatt maintains his office at 1200 New Jersey Avenue, SE,

5   Washington, DC 20590. Administrator Bhatt is sued in his official capacity.

6                          **PRIMARY GOVERNING LAW**

7                   **The National Environmental Policy Act (NEPA)**

8          18.

9          NEPA is the so-called Magna Carta of American environmental law, and it embodies

10  our Nation's environmental conscience. Congress issued a fundamental declaration of

11  values, including a call to action that focused on the protection of human health and the

12  environment in all federal agencies.

13         19.

14         NEPA has twin aims. First, NEPA requires federal agencies to consider every

15  significant aspect of the environmental impact of a proposed action. Second, NEPA

16  ensures that the agency will inform the public that it has indeed considered

17  environmental concerns in its decision-making process.

18         20.

19         According to 40 C.F.R. § 1502.1 (2016),[1] the primary purpose of a NEPA analysis is

20  to serve as an action-forcing device to ensure that the policies and goals defined in

21  NEPA are infused into the ongoing programs and actions of the Federal Government.

22  _____

23  [1] As noted in the RSEA itself, "the CEQ regulations that were in effect on November 17,
    2016, when the NEPA process for the I-5 Rose Quarter Improvement Project was
24  initiated, continue to apply to the I-5 Rose Quarter Improvement Project RSEA, as it is a

**PAGE 9 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1                                    21.

2       NEPA procedures ensure that environmental information is available to public

3   officials and citizens before decisions are made and before actions are taken. Accurate

4   scientific analysis, expert agency comments, and public scrutiny are essential to

5   implementing NEPA, pursuant to 40 C.F.R. § 1500.1(b) (2016).

6                                    22.

7       NEPA and its implementing regulations promulgated by the Council on

8   Environmental Quality ("CEQ") require federal agencies to prepare an environmental

9   impact statement ("EIS") for every recommendation or report on proposals for legislation

10   and other major federal actions significantly affecting the quality of the human

11   environment, pursuant to 42 U.S.C. § 4332(2)(C). Moreover, for those major federal

12   actions, agencies must analyze and disclose the environmental impact of the proposed

13   action, any adverse environmental effects which cannot be avoided should the proposal

14   be implemented, alternatives to the proposed action, the relationship between local

15   short-term uses of the human environment and the maintenance and enhancement of

16   long-term productivity, and any irreversible and irretrievable commitments of resources

17   which would be involved in the proposed action should it be implemented. Pursuant to

18   42 U.S.C. § 4332(E), agencies must study, develop, and describe appropriate

19   alternatives to recommended course of action in any proposal which involves

20   unresolved conflicts concerning alternative uses of available resources. Pursuant to 40

21   C.F.R. § 1508.9 (2016), an environmental assessment ("EA") shall include brief

22

23   _____

24   continuation of the ongoing NEPA process started under those regulations." RSEA p.5
     n.2.

**PAGE 10 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    discussions of the need for the proposal, of alternatives, and of the environmental

2    impacts of the proposed action and alternatives.

3                                    23.

4          NEPA requires federal agencies to analyze the direct, indirect, and cumulative

5    impacts of proposed actions, pursuant to 42 U.S.C. § 4332(2)(C)(i)-(ii), 40 C.F.R. §§

6    1508.7 (2016), 1508.8 (2016).

7                        **The Administrative Procedure Act (APA)**

8                                    24.

9          The Court's review of plaintiffs' NEPA and other claims is governed by the APA.

10                                   25.

11         Pursuant to 5 U.S.C. § 702, the APA mandates that a person suffering legal wrong

12   because of an agency action, or adversely affected or aggrieved by agency action

13   within the meaning of a relevant statute, is entitled to judicial review thereof.

14                                   26.

15         Pursuant to 5 U.S.C. §§ 706(2)(A) and (D), the reviewing court shall hold unlawful

16   and set aside agency actions, findings, and conclusions found to be arbitrary,

17   capricious, or an abuse of discretion or otherwise not in accordance with law, or which

18   have been taken without observance of procedure required by law.

19                        **PROCEDURAL BACKGROUND**

20                                   27.

21         On November 28, 2018, some of Plaintiffs requested an extension of the public

22   comment period, and the Defendants or their agents denied that request on January 11,

23   2019.

24

**PAGE 11 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1                                          28.

2        On February 15, 2019, the Defendants issued a Draft Environmental Assessment

3    ("DEA").

4                                          29.

5        On March 4, 2019, some of Plaintiffs requested that the agencies provide key data

6    that was not included in the DEA and its appendices. The agencies did not make this

7    requested information (roughly 632 pages) available until March 13, 2019.

8                                          30.

9        On March 18, 2019, some of Plaintiffs requested an extension to submit comments

10   on the DEA given that the agencies did not provide the public with access to all relevant

11   information for the DEA until well after the DEA was published. The agencies denied the

12   request for an extension of time to comment on the DEA.

13                                         31.

14       On March 23, 2019, through a public records request, ODOT released roughly 33GB

15   of electronic files containing engineering diagrams and drawings of the Project.

16                                         32.

17       On March 25, 2019 ODOT disclosed traffic modeling assumptions for the Project.

18                                         33.

19       On April 1, 2019, Plaintiffs and thousands of others submitted comments on the

20   DEA.

21                                         34.

22       On September 12, 2020, some of plaintiffs sent a letter to the agencies requesting

23   supplemental NEPA analysis based on significant new information.

24

**PAGE 12 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1                                                35.

2        On October 15, 2020, FHWA issued a response to the request to prepare

3    supplemental NEPA analysis, indicating that the agencies would respond to the letter

4    within the Revised Environmental Assessment ("REA").

5                                                36.

6        On October 30, 2020, the agencies issued the FONSI and REA for the Project.

7                                                37.

8        On November 6, 2020, the Federal Register published the Notice of Final Federal

9    Agency Actions on I-5 Rose Quarter Improvement Project in the City of Portland,

10   Multnomah County, Oregon.

11                                               38.

12       On April 2, 2021, some of the Plaintiffs filed a complaint contesting the validity of the

13   FONSI and REA for strikingly similar reasonings as this present complaint. Claims were

14   brought under NEPA, the APA, and the Department of Transportation Act.

15                                               39.

16       On January 18, 2022, the agencies withdrew the FONSI and REA.

17                                               40.

18       In November 15, 2022 FHWA and ODOT released a Supplemental Environmental

19   Assessment (SEA) for comment to the public.

20                                               41.

21       On January 4, 2023, Plaintiff NMF submitted a comment letter to the agencies

22   addressing concerns over the validity of the SEA.

23   / / / /

24

**PAGE 13 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

42.

2      On March 12, 2024, the agencies issued the present FONSI and RSEA for the

3  Project.

4

43.

5      On March 20, 2023, Plaintiff NMF submitted a letter to FHWA addressing the lack of

6  reasonably available funding given the current budgeting situation in the State of

7  Oregon.

8                           **FIRST CLAIM FOR RELIEF**

9                           **Violation of NEPA and the APA**
                            **Count I**
10      **Failure to Prepare an Environmental Impact Statement**

11

44.

12  Plaintiffs incorporate by reference ¶¶ 1-43.

13

45.

14      NEPA, specifically 42 U.S.C. § 4332(2)(C), requires agencies to prepare an EIS for

15  all major federal actions significantly affecting the quality of the human environment.

16

46.

17      Defendants prepared an EA for the Project. Pursuant to 40 C.F.R. § 1508.9(a)(1)

18  (2016), to instead prepare an EA, it must contain sufficient evidence and analysis for

19  determining whether to prepare an Environmental Impact Statement or a Finding of No

20  Significant Impact.

21

47.

22      Under 40 C.F.R. § 1508.27 (2016), which lists the regulatory factors used to

23  determine significance, the environmental impacts of the project are significant.

24

**PAGE 14 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  Defendants' authorization of the Project without preparing an EIS violates NEPA

2  because the Project is a major federal action significantly affecting the quality of the

3  human environment.

4                                                48.

5       The Project is significant under 40 C.F.R. § 1508.27(b)(1) (2016) because the

6  project may result in significant adverse environmental impacts, including increased

7  congestion and increase vehicular miles driven in the Project Area, resulting in

8  increased air pollution and greenhouse gases, and decreased safety along the freeway

9  and on city streets.

10                                               49.

11      The Project is significant under 40 C.F.R. § 1508.27(b)(2) (2016) because the

12 Project will increase the adverse environmental impacts associated with public health

13 and safety. While the project proposes to increase safety, the Project will widen the

14 highway immediately adjacent to Harriet Tubman Middle School, providing for, at the

15 very least, a 5 to 14 percent increase in vehicle trips in that area.[2] This will jeopardize

16 the safety of children and staff at the Harriet Tubman middle school by increasing the

17 capacity of the highway to accommodate greater traffic loads. That traffic will, in turn,

18 increase air pollution in the area of the middle school, as well as decrease safety along

19 the freeway and on City streets in the area. Furthermore, the Project's increased

20 capacity will, as noted in the RSEA, also increase greenhouse gases.[3] The Project will

21 also create a roadway capable of accommodating even more additional lanes of traffic

22

23  ────────────────

[2] RSEA, 3.13.2.4, p. 112.

24 [3] RSEA, 3.16.2, p. 123.

**PAGE 15 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  beyond what is proposed for the Project, and the adverse impacts of that increase in

2  capacity was not analyzed or disclosed in the RSEA.

3                                        50.

4      The Project is significant under 40 C.F.R. § 1508.27(b)(3) (2016) because the

5  project will significantly affect unique characteristics of the geographic area. Not only is

6  Harriet Tubman middle school located immediately adjacent to the Project Area but the

7  project will increase the proximity of the highway to the middle school.

8                                        51.

9      The Project Area and its vicinity are also home to a number of notable Black–owned

10  businesses and civic organizations. Bill Webb Elks Lodge, a property associated with

11  Black history in NE Portland, is located within the Project Area and is included on the

12  National Register of Historic Places. The Urban League of Portland, one of the Portland

13  Black community's principal advocacy and service organizations, is also located in the

14  area. All of these unique characteristics of the area will now be subject to worsening air

15  quality and increased vehicular use in the areas adjacent to these city features.

16                                       52.

17      The Project is significant under 40 C.F.R. § 1508.27(b)(4) (2016) because the

18  effects to the Project are highly controversial. The agencies' analysis of air quality,

19  transportation impacts, noise impacts, climate emissions, and so forth are contingent

20  upon the transportation modeling, much of which has been kept from the public's

21  scrutiny. For the modeling that has been disclosed, the agencies misused the modeling

22  data by, including adopting a modeling strategy and assumptions that are at odds with

23  the best available science on the effects of induced demand. The agencies also

24

**PAGE 16 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    erroneously relied upon assumptions related to vehicle fleet composition and turnover,

2    amongst others assumptions, to artificially reduce emissions. Furthermore, the agencies

3    analysis of the project is misleading and/or inaccurate concerning the size, nature,

4    and/or effect on future traffic demand as a result of the highway expansion. Finally, in

5    setting a baseline, the project relied upon a number of infrastructure projects, such as a

6    12-lane freeway bridge across the Columbia River, which have not yet even been

7    authorized, much less begun to be constructed. This was done despite repeated public

8    requests to at least fully explain how the erroneous or misused assumptions fit into the

9    agencies' decision-making process.

10                         53.

11      The Project is significant under 40 C.F.R. § 1508.27(b)(5) (2016) because the

12    effects on the human environment are highly uncertain. The agencies' analysis of air

13    quality, transportation impacts, noise impacts, climate emissions, and so forth are

14    contingent upon the transportation modeling, much of which has been kept from the

15    public's scrutiny. For the modeling that has been disclosed, the agencies misused the

16    modeling data by, including but not limited to, adopting a modeling strategy and

17    assumptions that are at odds with the best available science on the effects of induced

18    demand. The agencies also erroneously relied upon assumptions related to vehicle fleet

19    composition and turnover, amongst others assumptions, to artificially reduce emissions.

20    The agencies also relied upon a number of infrastructure projects which have not yet

21    even been authorized, much less begun to be constructed, all with uncertain effects on

22    the Project Area.

23    / / / /

24

**PAGE 17 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1                                                    54.

2          The Project is significant under 40 C.F.R. § 1508.27(b)(6) (2016) because the

3    project may establish a precedent for future actions with significant effects. The

4    agencies have included the roughly $3 billion Columbia River Crossing Project (CRC -

5    also known as the Interstate Bridge Replacement or IBR) within the alleged baseline.[4]

6    The Columbia River Crossing Project is a 12-lane-wide, five-mile-long freeway widening

7    project located approximately three miles north of the Project. If the Project is approved

8    as an RSEA and assumes the existence of the Columbia River Crossing Project, then

9    the Columbia River Crossing (which only now is going through its own NEPA process

10   under the name "Interstate Bridge Replacement") may be argued to be insignificant

11   under NEPA, when it certainly is not.

12                                                   55.

13         The Project will also create a roadway capable of accommodating additional lanes of

14   traffic beyond what is proposed for the Project. It will do so by creating an expansion to

15   the shoulder which, based on internal ODOT documents, could extend the road to up to

16   between 160-250 feet wide. This more than doubles the width of I-5. It includes a

17   "shoulder" that is far larger than even ODOT consultants believed was necessary for the

18   safety purposes. This massive expansion would allow for additional lanes of traffic to be

19   proposed or implemented in the future, most likely without any further environmental

20   analysis. Here is what the current proposal in the RSEA looks like in terms of lane and

21

22

23   _____

24   [4] RSEA Appendix C, *Reasonably Foreseeable Future Actions Comparison*, 2.2, p.3.

**PAGE 18 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    shoulder sizing with only one additional auxiliary lane:



8    Here is what that sized roadway could be re-striped to look like:



19                                  56.

20    That sort of "re-striping" without further environmental analysis would be consistent

21    with both prior projects and guidance issued by the Defendants. The direct and indirect

22    effects of that additional lane expansion have not been, and most likely given

23    Defendants prior conduct and guidance would never be, analyzed or disclosed. That

24

**PAGE 19 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    includes the impacts from traffic, noise, and pollution of the many thousands of vehicles

2    that those additional lanes would allow on the highway.

3                                        57.

4          The Project is significant under 40 C.F.R. § 1508.27(b)(7) (2016) because the

5    agencies have misconstrued the project's cumulative impacts. The Columbia River

6    Crossing is a reasonably foreseeable project utilized in determining a baseline, but the

7    agencies failed to prepare a cumulative impacts analysis for the Columbia River

8    Crossing. Congestion pricing (also known as value pricing or tolling) is also reasonably

9    foreseeable, as that has been planned for implementation along I-5 and Interstate 205

10   (I-205) by ODOT and/or the Oregon legislature. Nonetheless, Defendants failed to

11   prepare a cumulative impacts analysis for congestion pricing or to include that in the

12   cumulative impact analysis that was conducted.

13                                       58.

14         The Project is significant under 40 C.F.R. § 1508.27(b)(8) (2016) because the action

15   may adversely affect highways and culturally historic areas. As to highways, the effect

16   of the project will be to increase capacity of the highway, creating induced demand that

17   will then cause the new larger highway to also be filled to capacity, something

18   commonly known as the "fundamental law of road congestion."  The agencies also

19   erroneously relied upon assumptions related to vehicle fleet composition and turnover,

20   amongst others assumptions, to predict artificially reduced emissions. Actual emission

21   will be greater. The effect of the project will also adversely affect a number of notable

22

23

24

**PAGE 20 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  pillars of Portland's Black community, including the Bill Webb Elks Lodge, the Urban

2  League of Portland, the Harriet Tubman Middle School, and Lillis-Albina Park.[5]

3                                    59.

4       The Project is also significant under 40 C.F.R. § 1508.27(b)(10) (2016). The project

5  threatens to violate Federal, State, and local law, including Section 4(f) of the

6  Transportation Act, the Federal Highways Act, Executive Order 12898, Governor

7  Brown's Executive Order No. 20-04, as well as local land use laws and plans.

8                                    60.

9       Defendants' actions as described are arbitrary, capricious, not in accordance with

10  law, and without observance of procedures required by law, within the meaning of the

11  APA, 5 U.S.C. § 706.

12                                    61.

13       Plaintiffs are entitled to its reasonable fees, costs, and expenses associated with this

14  litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

15                              **Count II**

16       **Failure to Take a Hard Look at the Project's Direct, Indirect, and Cumulative**

17                              **Impacts**

18                                    62.

19       Plaintiffs incorporate by reference ¶¶ 1-43 and 60-61.

20       / / /

21  _____

22  [5] *See e.g., attached*, Exhibit #1, Letter from America Walks to U.S. Department of
     Transportation (July 24, 2024) (advocating against funding the highway expansion in
23  this project as it would "disconnect communities and repeat the harms of 20th century
     highway building that the [Reconnecting Communities and Neighborhood Grant]
24  program seeks to repair.")

**PAGE 21 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1          63.

2          Pursuant to 42 U.S.C. § 4332(2)(C)(i)-(ii); 40 C.F.R. §§ 1508.7-8 (2016), NEPA

3    requires federal agencies to analyze the foreseeable environmental impacts, including

4    direct, indirect, and cumulative impacts (including past, present, and reasonably

5    foreseeable actions) of major federal actions, as well as actions by state and local

6    authorities.

7          64.

8          *Inadequate Analysis of the No-Build Alternative and the Environmental Baseline.*

9    Defendants failed to take a "hard look" at the no-build alternative and the environmental

10   baseline. The agencies misconstrued the levels of traffic in the no-build alternative by

11   improperly inflating traffic levels and producing higher estimates of congestion than

12   would actually occur. The agencies misconstrued and misapplied models and modeling

13   data. The agencies relied on traffic modeling prepared for the 2014 Metro Regional

14   Transportation Plan, and have failed to account for or explain new modeling prepared

15   for the 2018 and 2023 Metro RTP. The agencies failed to fully disclose and document

16   the Project's traffic projections. The agencies misconstrued the no-build alternative by

17   including non-existing traffic from the as-of-yet unbuilt Columbia River Crossing, which

18   adds tens of thousands of imaginary vehicles and their fictitious emissions (and other

19   impacts).

20         65.

21         The agencies misconstrued the traffic data used for the Project. The Project

22   assumes that the Columbia River Crossing, a 12-lane-wide, five-mile-long freeway

23   project was built in 2015, but the agencies failed to substantiate or disclose their

24

**PAGE 22 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  assumptions for modeling and estimates of traffic levels generated by the Columbia

2  River Crossing, which is hardly a finished project which should be part of a no-action

3  baseline given that it is only going through its own NEPA analysis now.

66.

5  The agencies failed to include average daily traffic for the build and no-build

6  scenarios, one of the most commonly used metrics of traffic volume.

67.

8  *Direct and indirect impacts.* Defendants failed to take a hard look at the direct and

9  indirect impacts of the project.

68.

11  The agencies misconstrued the traffic estimates for the build alternative by

12  understating their traffic levels. The agencies relied upon conclusory assumptions and

13  discredited theories for carbon emissions, which understate carbon emissions.

69.

15  The agencies failed to adequately consider the impacts to pedestrian and bicycle

16  transportation. The Project's Clackamas Pedestrian and Bicycle Bridge will still increase

17  grade and create unsafe conditions with its inadequate design. Furthermore, by

18  widening the intersections around the Project area, the Project will put increased levels

19  of stress on local pedestrians and cyclists.

70.

21  Contrary to the scientific literature and documented impacts of widening freeways,

22  including I-5, the agencies failed to adequately consider the impact of induced and

23  latent demand, the phenomenon by which increases in highway capacity in urban areas

**PAGE 23 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    generate additional travel that leads to a recurrence of congestion at even higher levels

2    of traffic. Increased congestion will lead to increased pollution and greenhouse gases.

3    Not only will the project create greater emissions from increased congestion but the

4    widening will also reduce the distance between the highway and the Harriet Tubman

5    Middle School and its outdoor play area. Moreover, the agencies erroneously relied

6    upon assumptions related to vehicle fleet composition and turnover, amongst others

7    assumptions, to artificially reduce emissions.

8                                        71.

9        The agencies' analysis improperly assumes that build and no-build alternative will

10   have no impact on the pattern and intensity of traffic over the coming decades, even

11   though its own analysis showed a 5-14% increase in traffic demand in the Project Area.[6]

12                                        72.

13       The Project may create new urban land within the City of Portland through the use of

14   freeway lids with the possibility of supporting structures and other uses. The agencies,

15   however, failed to address or analyze the environmental impacts of creating new urban

16   land and uses within the Project Area.

17                                        73.

18       The Project will create a roadway capable of accommodating additional lanes of

19   traffic beyond what is proposed for the Project. The EA obfuscates the actual width of

20   the road, but estimates and agency documents indicate a roadway as wide as 160-250

21   feet, more than doubling the existing width of 82-feet. The agencies failed to analyze the

22

23   _____

24   [6] RSEA, 3.13.2.4, p.112.

**PAGE 24 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1   direct and indirect effects of such a significant widening of the roadway and an increase

2   in roadway capacity, including the impacts from traffic, noise, and pollution.

3                                          74.

4   The agencies failed to take a hard look at the environmental and economic impacts of

5   diverting money from other projects in the Portland-Vancouver metropolitan area, and,

6   instead, proposed to use approximately $1.9 billion for the Project.

7                                          75.

8   *Cumulative impacts.* Defendants failed to take a hard look at, adequately analyze, or

9   accurately represent the cumulative effect of past, present, and foreseeable projects.

10                                         76.

11      In the RSEA, the Columbia River Crossing is supposedly a reasonably foreseeable

12  project that adds many lanes across the Columbia River, but the agencies did not

13  prepare a cumulative impacts analysis that included that crossing in evaluating future

14  impacts, including traffic demand and the environmental impacts from such changes.

15  The agencies' position is clearly that other major traffic projects are vital and integral to

16  solving the congestion problem. Therefore, the scope of this environmental analysis is

17  inadequate and should be extended to include the analysis for at least the Columbia

18  River Crossing, and most likely the other projects that are part of the regionwide Urban

19  Mobility Strategy.

20                                         77.

21      Meanwhile, congestion pricing (or value pricing) is authorized and mandated by the

22  Oregon legislature, the City of Portland, the Metro Regional Government, and included

23  in Metro's 2023 Regional Transportation Plan as an anticipated project, a list that also

24  includes the Columbia River Crossing. However, the agencies failed and/or refused to

**PAGE 25 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    prepare a cumulative impacts analysis that included congestion pricing – claiming that it

2    was "not reasonably foreseeable," even after funding a study showing that value pricing

3    was necessary to reach the project's goals of reducing traffic congestion to adequate

4    levels.

5                                          78.

6    *Reliance on erroneous factual assumptions.* In its environmental analysis, the

7    agencies rely on the 'fact' that, at the time of issuing the RSEA and FONSI, the project's

8    anticipated cost would be $1.3 billion.

9                                          79.

10   Contrary to this 'fact,' the agencies regularly represent the actual cost of the entire

11   Project at between $1.5-1.9 billion, generally giving a $1.7 billion figure as a reasonable

12   stand-in for the actual range.[7] The agencies therefore knew of this higher figure in the

13   year leading up to the issuance of the FONSI and RSEA, and still relied on the lower

14   $1.3 billion figure in clear violation of their NEPA requirements.

15                                  **Count III**

16   **Failure to Analyze All Reasonable Alternatives and an Adequate Range of**

17                                  **Alternatives**

18                                          80.

19   Plaintiffs incorporate by reference paragraphs ¶¶ 1-43 and 60-61.

20   / / /

21   / / /

22

23   _____

24   [7] *See* ODOT*, Neighborhood Access and Equity (NAE) Program Grant Application*, p.16, Table-4, (September 28, 2023) ("Total Project Cost Estimate: $1,700,000,000").

**PAGE 26 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    81.

2    In both an EA and an EIS, NEPA - 42 U.S.C. § 102(2)(E) - requires the agency to

3    study, develop and describe appropriate alternatives to recommended courses of action

4    in any proposal which involves unresolved conflicts concerning alternative uses of

5    available resources.

6    82.

7    Further, pursuant to 40 C.F.R. § 1502.14(a) (2019) agencies shall rigorously explore

8    and objectively evaluate all reasonable alternatives in order to accomplish the project's

9    goals, and for alternatives which were eliminated from detailed study, briefly discuss the

10   reasons for their having been eliminated.

11   83.

12   For the Project, the agencies only considered two alternatives:  The Revised Build

13   option and a No-Build option.

14   84.

15   The agencies failed to consider, in detail, an alternative that would not require

16   billions dollars in public financing and still satisfy the clearly delineated purpose and

17   need of the Project.[8] Fiscally-conservative alternatives raised by Plaintiffs during the

18   Notice & Comment process, but not considered in detail, include congestion pricing,

19   lane closures, transit alternatives, a reduced or narrowed right-of-way, and alternatives

20   that do not include increasing the capacity of the freeway and the expenditure of billions

21   of dollars.

22   _____

23   [8] RSEA 1.4, p.5 ("[T]he purpose of the project is to improve the safety and operations
     on I- between I-405 at the Broadway/Weidler interchange, and on adjacent surface
24   streets in the vicinity of [that] interchange.")

**PAGE 27 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1                                      85.

2        Congestion pricing uses the power of the market to reduce the waste associated

3    with traffic congestion. Premium charges during periods of peak demand would

4    encourage road users to eliminate lower-valued trips, take them at a different time, or

5    choose alternative routes or modes of transportation. As part of the same legislation

6    that provided funding for the Project, the Oregon legislature also directed ODOT to

7    pursue tolling within the corridor. According to the FHWA, there is a consensus among

8    economists that congestion pricing represents the single most viable and sustainable

9    approach to reducing traffic congestion. The City of Portland Central City Plan also

10   directs ODOT to implement congestion pricing. Oregon Metro's 2023 Regional

11   Transportation Plan further includes I-5 congestion pricing within its list of Constrained

12   Projects (Project 12304). Aside from avoiding a costly expansion, congestion pricing

13   can also generate revenue.

14                                     86.

15       The agencies also failed to consider, in detail, a fiscally conservative alternative to

16   implement ramp closures at certain times throughout the day to allow traffic to flow

17   without interruption from incoming motorists. The agencies acknowledge that close

18   interchanges are a root cause of the issues the Project purports to address.

19                      **SECOND CLAIM FOR RELIEF**

20              **Violation of Transportation Act and the APA**

21                   **Failure to Satisfy the 4(f) criteria**

22                                     87.

23       Plaintiffs incorporate by reference ¶¶ 1-43 and 60-61.

24

**PAGE 28 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1            88.

2        Section 4(f) of the Transportation Act, 49 U.S.C. § 303 identifies the policy of the

3    U.S. Government that special effort should be made to preserve the natural beauty of

4    public parks, recreation lands, and historic sites.

5            89.

6        Pursuant to 49 U.S.C. § 303(c), a transportation project requiring the use of publicly

7    owned land of a public park, recreation area, or historic site of national, State, or local

8    significance is permitted only if there is no prudent and feasible alternative to using that

9    land and the project includes all possible planning to minimize harm to the park,

10   recreation area, or historic site resulting from the use. No prudent and feasible

11   alternatives exist if the project will have *de minimis* impact on public park, recreation

12   area, and historic sites, pursuant to 49 U.S.C. § 303(d).

13           90.

14       Use of a section 4(f) resource, according to 23 F.R. § 774.17, occurs when land is

15   permanently incorporated into a transportation facility, or when there is temporary

16   occupancy of land that is adverse in terms of the statute's preservation purpose,

17   pursuant to 23 C.F.R. § 774.13(d). Use of a section 4(f) resource also occurs when

18   there is a "constructive use" of a section 4(f) property which, pursuant to 23 C.F.R. §

19   774.15(a), occurs when the "projects proximity impacts are so severe that the protected

20   activities, features, or attributes that qualify that property for protection are substantially

21   impaired."

22           91.

23       Use of a 4(f) property may not be authorized unless a determination is made that

24

**PAGE 29 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  there are no feasible and prudent avoidance alternatives to the use of the land and the

2  action includes all possible planning to minimize harm to the property resulting from

3  such use; or a determination is made that use of the property would have a would have

4  a *de minimis* impact on the property, as defined by 23 C.F.R. § 774.17. A *de minimis*

5  impact determination must include public notice and opportunity for public review and

6  comment, as well as written concurrence received from the officials with jurisdiction over

7  the property that the project will not adversely affect the activities, features, or attributes

8  that make the property eligible for section 4(f) protection.

9  92.

10  The Project will result in construction of a noise wall, to be constructed either on or

11  immediately adjacent to Lillis-Albina Park. This will block parts of multiple official

12  viewpoints, resulting in either the actual occupation and use of the Park, or constructive

13  use of the Park.

14  93.

15  Defendants did not obtain the necessary concurrence from officials with jurisdiction

16  over the property that the adverse effects will be *de minimis*.

17  **THIRD CLAIM FOR RELEIF**

18  **Violation the Federal Highways Act and Implementing Regulations**

19  **Inadequate funding availability to approve a FONSI**

20  94.

21  Plaintiffs incorporate by reference ¶¶ 1-43 and 60-61.

22  95.

23

24

**PAGE 30 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    As laid out in a series of policy memos in 2011[9] and 2017, [10] FHWA interprets its

2    statutory and regulatory authority as mandating that it can only issue a final NEPA

3    document (such as a FONSI) once a set of requirements have been met.

4                                    96.

5        One key requirement is that, before signing a FONSI for a project in a Metropolitan

6    Planning Area - such as the Portland Metro Area - FHWA must ensure that the project

7    is complies with the requirements for "fiscal constraint." Fiscal constraint is found when

8    "there is sufficient financial information for demonstration that a project can be

9    implemented using committed, available, or reasonably available revenue resources."[11]

10                                   97.

11       The presence of fiscal constraint and reasonably available funding is generally

12   demonstrated by including funding for a subsequent phase of a metropolitan project,

13   such as this Project, in a Metropolitan Transportation Improvement Plan (MTIP) or a

14   Regional Transportation Plan (RTP) for a metropolitan area, as well as including the

15   estimated *full project cost* in the MTIP or RTP.[12] Here, the agencies claimed that this

16   rule is satisfied with full project cost inclusion on Oregon Metro's RTP.[13] Therefore, in

17

18   _____

19   [9] FHWA, SUPPLEMENT TO JANUARY 28, 2008 'TRANSPORTATION PLANNING REQUIREMENTS
     AND THEIR RELATIONSHIP TO NEPA APPROVALS' (February 9, 2011),
20   https://www.fhwa.dot.gov/planning/tpr_and_nepa/tprandnepasupplement.cfm#ftn1
     ("2011 FHWA Supp").
21   [10] FHWA, MEMO: CLARIFYING FISCAL CONSTRAINT GUIDANCE (May 15, 2017),
     https://www.fhwa.dot.gov/planning/clarify_fiscal_constraint.cfm ("2017 FHWA
     Clarification").
22   [11] 2011 FHWA Supp, p.2, Table 1.
     [12] 2017 FHWA Clarification; *RSEA, Appendix G,* p 61. (emphasis added)
23   [13] *Id.* at p. 60; The project's full cost is not included on the Metro MTIP at all, and
     therefore this requirement is not satisfied through that route either, and the agencies
24   have not indicated to the contrary.

**PAGE 31 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1  order to reasonably sign off on the FONSI, FHWA must ensure that the estimated *full*

2  *project cost* be present in the RTP's financially constrained list.

3                                    98.

4       If an EA has a project cost significantly different than the fiscally constrained

5  estimate, FHWA's interpretations further mandate that a "plan and/or STIP/TIP

6  amendment is necessary prior to the final NEPA decision."[14]

7                                    99.

8       The Financially Constrained Projects list in Metro's 2018 RTP describes the

9  Project's estimated full cost at $375 million.

10                                   100.

11      The Financially Constrained Projects list in Metro's 2023 RTP describes the

12  Project's estimated full cost at $1.3 billion. This is the highest cost estimate represented

13  in the RSEA and FONSI.[15]

14                                   101.

15      However, the cost of the Project had already risen considerably. The full Project cost

16  was represented by the agencies in multiple grant applications *before the FONSI and*

17  *RSEA were issued* as between $1.5 and $1.9 billion, an approximately 40% increase in

18  full project costs as compared to the 2023 Metro RTP estimate.[16]

19

20  _____

[14] 2011 FHWA Supp, p.8, Question 18.
21  [15] *See RSEA, Appendix G,* P. 61 ("estimated full Project cost of $1.3 billion. . .").
    [16] *See* ODOT, *Neighborhood Access and Equity (NAE) Program Grant Application*,
22  p.16, Table-4, (September 28, 2023) (Total Project Cost Estimate: $1,700,000,000);
    *See* ODOT, *Infrastructure for Rebuilding America (INFRA) Grant Application*, p. 1 (May
23  6, 2024) ("as of June 2023, the total project cost estimate is **$1.5 to $1.9 billion**. For the
    purposes of this INFRA Large project grant application, the total project cost is shown at
24  $1.9 billion to reflect the high end of this range") (emphasis added).

**PAGE 32 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1                                         102.

2        Given that the agencies knew of the exorbitant cost of funding the Project had risen

3   to as much as $1.9 billion, their conclusions concerning the availability of reasonably

4   available funding and fiscal constraint were factual errors and legally unlawful. The

5   agencies knew that, by relying on either the 2018 Metro RTP which lists the project at

6   $375 million, or the 2023 Metro RTP which lists the project at $1.3 billion, fiscal

7   constraint could not be established for the Project at the time that FHWA issued the

8   FONSI. Instead, the agencies attempted to satisfy a statutory and regulatory

9   requirement that the project be fiscally constrained by relying on a promise in a Metro

10  RTP that showed reasonably available funding approximately 30% below the most up-

11  to-date estimated cost of the project.

12                                        103.

13       The anticipated funding in the 2023 Metro RTP is further unavailable because it has

14  since been spent on an alternate ODOT project. ORS 367.095(2), the source of a

15  significant amount of funding predictions, was amended in 2021 by House Bill 3055.

16  That amendment altered the text of the statute, such that funding which previously was

17  exclusively available for use on the Interstate 5 Rose Quarter Project is now *also*

18  available to fund, amongst others, a $500 million project to build Abernethy Bridge.

19  Some of these funds, again originally anticipated to exclusively fund this Project, have

20  already been spent on this alternative Abernethy Bridge project, making those funds

21  unavailable for highway expansion.

22  / / /

23  / / /

24

**PAGE 33 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1                           104.

2       Therefore, the agencies relied on inadequate funding assurances which the

3 agencies knew would fail to fund the entire Project.

4                     **PLAINTIFF'S PRAYER FOR RELIEF**

5       WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment

6 in favor of Plaintiff and issue the following relief:

7       •  Declare that one or more of the Defendant's violated NEPA;

8       •  Declare that one or more of the Defendants violated the APA;

9       •  Declare that one or more of the Defendants violated the Transportation

10         Act;

11       •  Declare or direct that Defendants must prepare an Environmental Impact

12         Statement due to the Project's potential significant effects;

13       •  Vacate and remand the FONSI and RSEA;

14       •  Enjoin Defendants from implementing the Project until Defendants have

15         complied with NEPA, the APA, and the Transportation Act;

16       •  Award Plaintiffs their reasonable attorney fees, costs, and expenses

17         associated with this litigation pursuant to the Equal Access to Justice Act,

18         28 U.S.C. § 2412 or other authority; and

19       •  Grant Plaintiffs such additional and further relief as the Court deems just

20         and equitable.

21

22

23

24

**PAGE 34 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1    Respectfully submitted this 9th day of August, 2024,

2

3                                    /s/ *Karl G. Anuta*
                                     Karl G. Anuta (OR Bar No. 851423)
4                                    Law Office of Karl G. Anuta PC
                                     735 SW 1st Ave, 2nd Fl.
5                                    Portland, OR 97204
                                     Tel. (503) 827-0320
6                                    kga@lokga.net

7                                    Corey Oken (OR Bar No. 240290)
                                     Law Office of Karl G. Anuta, PC
8                                    735 SW 1st Ave., 2nd Fl.
                                     Portland, OR 97204
9                                    Tel. (503) 827-0320
                                     corey@lokga.net

10                                   Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**PAGE 35 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**



**July 24, 2024**

To:    Secretary Pete Buttigieg, Department of Transportation

CC:    Administrator Shailen Bhatt, Federal Highway Administration
       Acting Under Secretary Christopher Coes, Department of Transportation

Subject: Reconnecting Communities as a principle for **ALL** USDOT discretionary grant programs

Dear Secretary Buttigieg,

We, the undersigned 155 organizations**,** often hear that Reconnecting Communities is a principle at the US Department of Transportation, not just a grant program. Yet many state departments of transportation continue to seek federal discretionary grant funding for projects that run counter purpose to this principle. Some of them are successful. Some of them promote damaging highway expansions under the guise of Reconnecting Communities, subverting the principle.

A case in point is an application like the Oregon Department of Transportation's (ODOT's) FY 25-26 I-5 Rose Quarter Improvement Project to USDOT's INFRA program.[1] The I-5 Rose Quarter Improvement Project began in 2017 as a highway widening project and remains a highway widening project - with plans to increase I-5's existing width by two to three times![2] Community advocates in Portland have pushed instead for a highway cap, to partially mitigate harm done to the Black community in North Portland's Albina neighborhood from the original construction of I-5. ODOT has adopted the cap into its plans, because it anticipates being able to leverage programs like USDOT's Reconnecting Communities and Neighborhoods to unlock money for the project's expansion component.[3] As expected, ODOT's INFRA application bundles together highway expansion and highway cap, despite the RCN program's insistence that its programming cannot be used for building new highway capacity.[4]

---

[1] ODOT's scope for the project can be found here. https://www.i5rosequarter.org/media/m04lalit/rq-infra-report-budget_20240506.pdf
[2] Through a public records request, advocates from No More Freeways have found that ODOT intends to expand the footprint of I-5 through the Rose Quarter from 82 feet wide to 160 feet wide (and as much as 250 feet wide in some sections). This is wide enough to be striped as a 10-lane highway. ODOT has not made this information publicly available. No More Freeway's letter can be read here: https://nomorefreewayspdx.com/wp-content/uploads/2024/07/070224-NMF-Comments-opposing-Oregon-DOT-INFRA-grant-application-as-submitted.pdf
[3] An August 2022 letter from ODOT to the Oregon legislature requesting funding the project's new lanes makes this clear: "Any award of RCP funding would represent an initial investment in the highway cover and would unlock the potential for additional Federal funding." https://www.oregon.gov/odot/IF/EboardRequests/ODOT_IIJA%20Reconnecting%20Communities%20Rose%20Quarter%20Request%20to%20Apply%20Grant_Letter.pdf
[4] USDOT wrote in a letter announcing ODOT's receipt of the RCN grant: "Projects receiving RCN grant funding cannot be used for additional through travel lanes for single-occupant passenger vehicles or highway expansion." That letter can be read here: https://www.i5rosequarter.org/media/p3jd3zls/rcn-2023-capital-award-letter-rose-quarter.pdf

Exhibit 1 - Page 1 of 6



Adding lanes to a highway and expanding its footprint disconnects communities and repeats the harms of 20th century highway building that the RCN program seeks to repair. Any project that pursues this goal cannot simultaneously claim that it reconnects communities.

We ask that USDOT fund only the portions of discretionary grant applications that align with the principle of Reconnecting Communities, in cases where applicants apply to USDOT programs seeking to leverage the Reconnecting Communities elements to unlock funding for associated highway widening.

Furthermore, we applaud that this year's Notice of Funding Opportunity for the Reconnecting Communities and Neighborhoods program asks applicants if a highway expansion is associated with the project and reduces the application's score if the answer is yes. This criterion should be applied to all USDOT discretionary grant programs, to reinforce Reconnecting Communities as a USDOT principle.

The harms of additional lanes of freeway in vulnerable communities are myriad and significant - increased air pollution, greater noise pollution, contributions to the urban heat island effect, loss of affordable housing, more impermeable surfaces increasing flood risk, and of course greater carbon emissions from induced driving - at a time in which communities across America are struggling to find answers to these overlapping challenges while adapting to a quickly changing climate. Reconnecting Communities as a principle and a guiding light for all USDOT discretionary programs has the power to tackle these challenges head on.

Signed,

| | |
|---|---|
| **America Walks, initiating organization** | **Allendale Strong** |
| *National* | *Shreveport, LA* |
| **#blvdtampa** | **Alliance for a Just Society** |
| *Tampa, FL* | *National* |
| **1000 Friends of Oregon** | **Bergen County Complete Streets** |
| *Oregon (statewide)* | *Fort Lee, NJ* |
| **1000 Friends of Wisconsin** | **Bike Durham** |
| *Wisconsin (statewide)* | *Durham, NC* |
| **350 Milwaukee** | **Bike Hoboken** |
| *Milwaukee, WI* | *Hoboken, NJ* |
| **Active San Gabriel Valley** | **Bike JC** |
| *El Monte, CA* | *Jersey City, NJ* |
| **Air Alliance Houston** | **Bike Long Beach** |
| *Houston, TX* | *Long Beach, CA* |
| **Albany Riverfront Collaborative** | **Bike Loud PDX** |
| *Albany, NY* | *Portland, OR* |

2

Exhibit 1 - Page 2 of 6



**Bike North Bergen**
*North Bergen, NJ*

**BikeWalkKC**
*Kansas City, MO*

**BQE Environmental Justice Coalition**
*New York, NY*

**Brain Injury Association of Missouri**
*Columbia, MO*

**Bridge Forward Cincinnati**
*Cincinnati, OH*

**California Walks**
*California (statewide)*

**Capital Streets**
*Albany, NY*

**Central Maryland Transportation Alliance**
*Baltimore, MD*

**Chattanooga-Hamilton County/North Georgia Metropolitan Planning Organization**
*Chattanooga, TN*

**Citizens' Alliance for a Sustainable Englewood**
*Englewood, CO*

**City Observatory**
*Portland, OR*

**Claiborne Avenue Alliance Design Studio**
*New Orleans, LA*

**Climate and Community Project**
*National*

**Climate Resolve**
*Los Angeles, CA*

**ClimatePlan**
*California (statewide)*

**Coalition Against the Mid-States Corridor**
*Jasper, IN*

**Coalition for A New Dallas**
*Dallas, TX*

**Colorado Community Rights Network**
*Colorado (statewide)*

**Colorado Jewish Climate Action**
*Colorado (statewide)*

**Colorspace Architecture + Urban Design**
*San Marcos, TX*

**Community First Coalition**
*El Paso, TX*

**Community for Sustainable Energy**
*Fort Collins, CO*

**Congress for the New Urbanism**
*National*

**Connecting Urban Erie**
*Erie, PA*

**Covington Associates Consulting**
*Buffalo, NY*

**Creative Development Partners**
*Oakland, CA*

**Day One**
*Pasadena, CA*

**Denver Streets Partnership**
*Denver, CO*

**Detroit Greenways Coalition**
*Detroit, MI*

**Devou Good Foundation**
*Cincinnati, OH*

**Duluth Waterfront Collective**
*Duluth, MN*

**Earth Day Mobile Bay, Inc.**
*Farhope, AL*

**East Coast Greenway Alliance**
*National (East Coast)*

**East Side Collaborative Partnership**
*Buffalo, NY*

**El Paso Streets Coalition**
*El Paso, TX*

**ForeverGreen Trails**
*Tacoma, WA*

**Friends of Great Highway Park**
*San Francisco, CA*

**Friends of Metcalf Park**
*Orange, NJ*

Exhibit 1 - Page 3 of 6



**Friends of Slow Streets**
*Grand Rapids, MI*
**Frontier Metropolitan Planning Organization**
*Fort Smith, AR*
**Gainesville-Area Action for Environmental Justice**
*Gainesville, FL*
**Glendale Environmental Coalition**
*Glendale, CA*
**Greater Park Hill Community, Inc.**
*Denver, CO*
**GreenLatinos**
*National*
**Green New Deal Network**
*National*
**GrowSmart Maine**
*Maine (statewide)*
**HEAL Utah**
*Salt Lake City, UT*
**Health by Design**
*Indiana (statewide)*
**Hinge Neighbors Inc.**
*Rochester, NY*
**Hudson County Complete Streets**
*Hudson County, NJ*
**I-475 Neighborhoods Coalition**
*Toledo, OH*
**Idaho Walk Bike Alliance**
*Idaho (statewide)*
**Institute for Public Architecture**
*New York, NY*
**Law Office of Dennis M Grzezinski**
*Milwaukee, WI*
**Lid I-5**
*Seattle, WA*
**LINK Houston**
*Houston, TX*
**Living Streets Alliance**
*Tucson, AZ*

**Local Motion**
*Burlington, VT*
**Louisiana 4-Corners Coalition for Transportation Planning Reform**
*Louisiana (statewide)*
**Madison Area Bus Advocates**
*Dane County, WI*
**Mainers for Smarter Transportation**
*Portland, ME*
**Marin County Bicycle Coalition**
*Marin County, CA*
**Mayfair Park Neighborhood Association**
*Denver, CO*
**Mental Health & Inclusion Ministries**
*Colorado (statewide)*
**Metropolitan Planning Council**
*Chicago, IL*
**Milwaukee Riverkeeper**
*Milwaukee, WI*
**Mobilify Southwestern Pennsylvania**
*Pittsburgh, PA*
**Montbello Neighborhood Improvement Association**
*Denver, CO*
**Mothers Out Front Colorado**
*Colorado (statewide)*
**Move Redmond**
*Redmond, WA*
**Natural Resources Defense Council**
*National*
**New Jersey Bike & Walk Coalition**
*New Jersey (statewide)*
**Nikhil Badlani Foundation**
*West Orange, NJ*
**No More Freeways**
*Portland, OR*
**North Central Kansas Coordinated Transit District**
*Salina, KS*
**North Range Concerned Citizens**
*Commerce City, CO*

Exhibit 1 - Page 4 of 6



**North Salt Lake City Council**
*North Salt Lake, UT*
**Oklahomans For Responsible Transportation**
*Oklahoma City, OK*
**Olathe Public Schools**
*Olathe, KS*
**OPAL Environmental Justice Oregon**
*Portland, OR*
**Oregon Walks**
*Oregon (statewide)*
**Our Little Rock**
*Little Rock, AR*
**Our Streets**
*Minneapolis, MN*
**Palm Beach County Environmental Coalition**
*Lake Worth, FL*
**Parking Reform Network**
*National*
**Pedestrian Dignity Project**
*National*
**Pinnacle Prevention**
*Chandler, AZ*
**PLACE Initiative**
*Portland, OR*
**Precinct 2, El Paso County, Texas**
*El Paso, TX*
**Puente Latino Association Inc**
*Long Beach, CA*
**Reconnect Austin**
*Austin, TX*
**Reconnect Rochester**
*Rochester, NY*
**Reconnect South Park Coalition**
*Seattle, WA*
**Reimagine I-175 St Pete**
*St. Petersburg, FL*
**Restore Our Community Coalition**
*Buffalo, NY*

**Rethink35**
*Austin, TX*
**Ride the Cov**
*Covington, KY*
**Riders Alliance**
*New York, NY*
**Roosevelt Boulevard Subway**
*Philadelphia, PA*
**RTD Rider's Alliance**
*Denver, CO*
**Sacramento Area Bicycle Advocates**
*Sacramento, CA*
**Safe Streets Austin**
*Austin, TX*
**SafeStreetsJC**
*Jersey City, NJ*
**Scajaquada Corridor Coalition**
*Buffalo, NY*
**Sierra Club**
*National*
**Spirit of the Sun**
*Denver, CO*
**Stop TxDOT I-45**
*Houston, TX*
**Streets For All**
*Los Angeles, CA*
**Strong Towns Grand Rapids**
*Grand Rapids, MI*
**Sunnyside United Neighbors, Inc**
*Denver, CO*
**Sunrise Movement**
*National*
**Sustain Charlotte**
*Charlotte, NC*
**Texas Streets Coalition**
*Texas (statewide)*
**The Brooklyn Heights Association**
*Brooklyn, NY*
**The New Haven Safe Street Coalition**
*New Haven, CT*

Exhibit 1 - Page 5 of 6



**The Transit Coalition**
*San Fernando, CA*
**The Urbanist**
*Seattle, WA*
**Transbay Coalition**
*Oakland, CA*
**Transform**
*Oakland, CA*
**Transport Hartford**
*Hartford, CT*
**Transportation Choices Coalition**
*Washington (statewide)*
**Transportation for America**
*National*
**Transportation Riders United**
*Detroit, MI*
**Union of Concerned Scientists**
*National*
**Unite North Metro Denver**
*Denver, CO*
**US High Speed Rail Association**
*Washington, DC*
**Utah Rail Passengers Association**
*Salt Lake City, UT*
**Velo Paso Bicycle-Pedestrian Coalition**
*El Paso, TX*
**Vermont Energy Education Program**
*Montpelier, VT*
**Vibrant Littleton**
*Littleton, CO*
**VT Clean Cities and Communities at the University of Vermont Transportation Research Center**
*Burlington, VT*
**WalkMassachusetts**
*Massachusetts (statewide)*
**We Are Women Warriors**
*Buffalo, NY*
**WeeBiken**
*Weehawken, NJ*

**Weequahic Park Association**
*Newark, NJ*
**West North Avenue Development Authority**
*West Baltimore, MD*
**Wheat Ridge Active Transportation Advisory Team**
*Wheat Ridge, CO*
**Wisconsin Council of the Blind & Visually Impaired**
*Wisconsin (statewide)*
**Yolo Mobility**
*Davis, CA*

Exhibit 1 - Page 6 of 6